UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,

                          Plaintiff,

v.

JEROME C. RUZICKA (1),
SCOTT A. NELSON (2),
W. JEFFREY TAYLOR (3),
LAWRENCE W. MILLER (4), and
LAWRENCE T. HAGEN (5),

                          Defendants.

Criminal No. 16-246 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER**

---

Gregory G. Brooker, Interim United States Attorney, and Benjamin F. Langner, Lola Velazquez-Aguilu, and Surya Saxena, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for plaintiff.

John C. Conard, **JOHN C. CONARD PLLC**, 310 Fourth Avenue South, Suite 5010, Minneapolis, MN 55415, for defendant Jerome C. Ruzicka.

Casey T. Rundquist and William J. Mauzy, **MAUZY LAW PA**, 800 Hennepin Avenue, Suite 800, Minneapolis, MN 55403, for defendant W. Jeffrey Taylor.

Paul C. Engh, 200 South Sixth Street, Suite 420, Minneapolis, MN 55402, for defendant Lawrence W. Miller.

Kevin J. Short, 150 South Fifth Street, Suite 3260, Minneapolis, MN 55402, for defendant Lawrence T. Hagen.

Defendants Jerome Ruzicka, W. Jeffrey Taylor, Lawrence Miller, and Lawrence Hagen have been charged in connection with the alleged embezzlement of funds from

Starkey Laboratories. Citing the Supreme Court's decision in *Napue v. Illinois*, 360 U.S. 264 (1959), Miller – joined by his co-defendants – moves for the Government to correct false testimony presented by Government witnesses. The alleged perjured statements fall in two categories: (1) contradictions between the testimony of Starkey CEO William Austin and other fact witnesses and (2) contradictions between the testimony of Austin and Government agents. Because the Court concludes that the Defendants have not shown that the Government has knowledge about the truth underlying the contradictions between Austin and other fact witnesses, the Court will deny Miller's motion with respect to this category of alleged perjuries. However, because the Court concludes that the Government has knowledge about two specific instances of perjury related to contradictions between the testimony of Austin and the Government agents, the Court will grant Miller's motion in part and order the Government to correct these statements pursuant to its constitutional duty under *Napue*.

## DISCUSSION

### I.  STANDARD OF REVIEW

The prosecution's use of false testimony to obtain a conviction is a violation of due process. *Napue*, 360 U.S. at 269. When false testimony arises during the course of trial, "[t]he duty to correct false testimony is **on the prosecutor, and that duty arises when the false evidence appears**." *See United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) (emphasis added) (applying the *Napue* rule).

In *Napue v. Illinois*, the Supreme Court of the United States acknowledged that "it is established that a conviction obtained through use of **false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment**." 360 U.S. at 269 (emphasis added). "The same result obtains when the State, although not soliciting false evidence, **allows it to go uncorrected when it appears**." *Id.* (emphasis added). This principle holds true even when the false testimony "goes only to the credibility of the witness." *Id.*

Since *Napue*, the Supreme Court has reaffirmed that "**[a] new trial is required if 'the false testimony . . . could in any reasonable likelihood have affected the judgment of the jury.**" *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quoting *Napue*, 360 U.S. at 271) (alteration in original) (emphasis added).

To prove a *Napue* violation, the defendant must show "(1) the prosecution used perjured testimony; (2) the prosecution should have known or actually knew of the perjury; and (3) there was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *United States v. West*, 612 F.3d 993, 996 (8th Cir. 2010) (quoting *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007)).

With respect to the first element, "[m]erely inconsistent statements do not establish use of false testimony." *West*, 612 F.3d at 996. "[I]t is not improper to put on a witness whose testimony may be impeached." *Id.* (quoting *United States v. Bass*, 478 F.3d 948, 951 (8th Cir. 2007)). The jury is responsible for resolving these conflicts in testimony by assessing the credibility of the witnesses. *Id.* at 996-97 (citing *United States v. Thompson*, 560 F.3d 745, 748-49 (8th Cir. 2009)).

The second element is established if "the government **knowingly, recklessly or negligently used the false testimony**." *United States v. Tierney*, 947 F.2d 854, 860-61 (8th Cir. 1991). "[N]o constitutional violation occurs when the government has no reason to believe that the testimony was false." *United States v. Nelson*, 970 F.2d 439, 443 (8th Cir. 1992). There is no *Napue* violation where the Government knows of factual inconsistences, but not which statement is the truth. *Bass*, 478 F.3d at 951. In *Bass*, the Eighth Circuit found that there was no *Napue* violation because "defense counsel knew at least as much as the government did, if not more, about the [the witness's] prior inconsistent statements and was able to subject his testimony to cross-examination on each material point." *Id.* From the Court's review of the case law, *Napue* violations often turn on this second element. *See, e.g.*, *Bass*, 478 F.3d at 951; *United States v. Perkins*, 94 F.3d 429, 432-33 (8th Cir. 1996); *Nelson*, 970 F.2d at 443.

The third element is established unless the "failure to disclose [the fact that the testimony is perjured] would be harmless beyond a reasonable doubt." *United States v. Duke*, 50 F.3d 571, 577 (8th Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

## II.  AUSTIN'S TESTIMONY

### A. Statements Contradicted by Nelson and Longtain

First, Miller identifies nine contradictions between the testimony of Austin and other fact witnesses. (*Napue* Mot. at 3-5, Feb. 25, 2018, Docket No. 366.) In particular, Miller argues that the Government should have known of the falsity of Austin's testimony because it was contradicted by the testimony of Scott Nelson, Jeff Longtain,

and other Government fact witnesses. (*Id.*) The Court acknowledges that many of these inconsistencies are egregious, particularly because all of the inconsistencies stem from **only** the Government's case-in-chief.

However, on this record, the Court concludes that it has no reason to believe that the Government knows which of these contradicting statements are false. *See West*, 612 F.3d at 996-97. As far as the Court is aware, the Government has as much information as Defendants about the conflicting testimony of Austin and the other Government witnesses. *See Bass*, 478 F.3d at 951. In order to correct the false testimony, the Government would have to know which statement is false. In short, the Court does not believe that the Government knows how to correct the inconsistent testimony so that the record reflects reality. *Foster*, 874 F.2d at 495. Accordingly, the Court concludes that this is a question of credibility for the jury. *West*, 612 F.3d at 996-97. Because the Court concludes that Defendants have not shown that the Government knows which of the witnesses perjured themselves, the Court will deny the motion in this regard.

To be clear, the Court is **not** holding that the Government does not have the obligation to correct these statements if it knows which are false. The Court is merely denying the *Napue* Motion with regard to these particular inconsistencies because Miller has not satisfied the second element. *See West*, 612 F.3d at 996-97. If the Government **has knowledge** that *any* **of its witnesses perjured themselves**, it is required to **disavow** the perjured testimony and **correct** the testimony. The Court will therefore generally order the Government to correct any testimony that it knows is false, consistent with its constitutional duty under *Napue* and its progeny. *Foster*, 874 F.2d at 495.

### B. Statements Contradicted by Government Agents

Second, Miller identifies two contradictions between the testimony of Austin and two Government agents. (*Napue* Mot. at 6.) First, Miller argues that Austin perjured himself by testifying that he did not tell Agent Brian Kinney that he shredded the descending gross income reports. (*Id.*) Second, Miller argues that Austin perjured himself by testifying that Ruzicka drafted an amendment to his employment contract and that this amendment was discussed, drafted, and signed in one day. (*Id.*) Curiously, the Government's response to Miller's motion does not address the contradictions between the testimony of Austin and the two Government agents. (Gov. Resp. to *Napue* Mot. at 1-8, Feb. 26, 2018, Docket No. 372.)

### 1. Kinney

Miller argues that the Government knows that either Austin or Kinney perjured himself because the Government knows whether Austin told Kinney that he shredded the descending gross income reports.[1] The Court will conclude that the Government knows or should know which statement is false and, therefore, has a constitutional duty to correct the perjured testimony. *Foster*, 874 F.2d at 495.

On January 23, 2018, Brian Kinney testified as follows on cross-examination:

> Q.   The next claim that was made in your search warrant application was that Bill Austin liked to shred these descending gross reports. Do you remember making that?

---

[1] The Court will not make assumptions about whether it was Austin or Kinney who perjured himself, because the Court does not know. However, the Government should know and, therefore, it is the Government's obligation to correct the record.

A. I believe **that's what he informed us**. He would destroy them.

. . .

Q. Well, you repeated the claim in your search warrant application under oath. Do you or do you not believe that it's true?

A. **He told us they were shredded, so I take that as a belief, yes.**

Q. He told you that and you took it as a belief?

A. Yes.

Q. Without confirmation?

A. That he destroys them.

Q. Without confirmation?

A. What do you mean, without confirmation?

Q. When you say I took it as a belief, the person under oath in that application was you?

A. Correct.

Q. Did you do anything to confirm his claims before you repeated them under oath?

A. **The documents [had] been . . . shredded according to Mr. Austin.** How do you do any due diligence to recoup that document or find out what happened to it[?]

Q. So just because we're in court I have to insist on the rules and ask you questions, and that question would be, just, did you do anything to confirm it?

A. We did nothing further to confirm that, no.

According to Kinney, Austin told him that he shreds the descending gross income reports. Kinney then used Austin's statement to secure a search warrant in order to further investigate this case.

Austin's testimony contradicted the testimony of Kinney. On February 9, 2018, Austin testified on direct that he has "never shredded a document in [his] life." The subject of shredding documents was elaborated on during cross-examination of Austin on February 12, 2018:

> Q. Is it true that you told us on direct examination on Friday afternoon that you have never shredded a document in your life?
>
> A. In my recollection, I have never stuffed a piece of paper in one of those things.
>
> Q. I'm just asking if you recall that that was your testimony?
>
> A. I do.
>
> Q. And that was your testimony?
>
> A. It was.
>
> Q. Okay. However, **you told Agent Kinney that you typically shredded the list after he reviewed it because of the confidential nature of the information, isn't that true?**
>
> A. **I have never shredded anything.**
>
> Q. **Is it true that you told Agent Kinney that you did?**
>
> A. **I don't recall telling Agent Kinney that.**
>
> . . .
>
> Q. I want to show you a recording of the statement that report that Agent Kinney did and see if it reflects your recollection?

> [A.] **This says Austin typically shredded the list. I didn't say I typically shredded the list since I have never shredded anything.** Typically I was asked by Larry Miller to shred the list or destroy it. Because Mr. Miller asked me to do that didn't mean I was going to do it. I usually took the paper home and looked at it, and when I decided to destroy it, I put it in the recycle waste paper bins that are blue. I figured no one else would look in the garbage. I'm the only one that looks in it.
>
> Q. In the garbage?
>
> A. Yeah. I look in the garbage. I find waste paper that I can use and recycle and write on the back of it. Sometimes I find interesting things there.
>
> Q. So just to be clear, **you deny ever having said that to Agent Kinney?**
>
> A. **I don't think it says it here that I said it to Agent Kinney, but I do deny it.**

Austin testified that (1) he never shreds documents, and (2) he never told Kinney that he shreds the descending gross income reports.

The Court finds that either Kinney or Austin must have provided false testimony. *See West*, 612 F.3d at 996. This is a simple falsity: either Austin did or did not tell Kinney during the interview that he shreds the descending gross income reports. This is not the mere failure of Austin to recall what he told Kinney. Austin affirmatively denied telling Kinney that he shreds documents and went so far as to state that he has "never shredded a document in [his] life." Nor can this be the mere failure of Kinney to recall what Austin told him. Kinney used Austin's statement to secure a search warrant.

Accordingly, the Court finds that either Kinney or Austin perjured himself with respect to whether Austin told Kinney that he shreds the descending gross income reports.

The Court finds that the Government knows or should know whether Austin told Kinney that he shreds the descending gross income reports. *See West*, 612 F.3d at 996. This is not a situation where the Government and the Defendants have equal information about the inconsistent statements. *Cf. Bass*, 478 F.3d at 951. Kinney is an agent of the Federal Bureau of Investigation. Because FBI interviews are not recorded, Defendants must rely on the written statements prepared by Kinney to know what was said during the course of the Government's investigatory interviews. Because the perjured testimony concerns a statement made in a Government interview, the Government should know whether Kinney or Austin perjured himself.[2]

Finally, the Court finds that the falsity of this statement is material for a number of reasons. *See West*, 612 F.3d at 996. First, whether Austin destroys documents is a contentious factual issue that has explored throughout this case. This statement is directly relevant to that issue. Second, whether Kinney or Austin perjured himself on the stand goes to their credibility as witnesses. *See Napue*, 360 U.S. at 269. Third, the efficacy of the Government's investigation has been a contentious issue throughout trial. Kinney used the statement in a search warrant. For these reasons, the Court finds that the falsity of the statement is material. *See West*, 612 F.3d at 996.

---

[2] The Court does not believe that the Government has knowledge as to whether Austin actually shreds documents. The Court's ruling is limited to whether Austin made the relevant statement to Kinney.

In sum, the Court finds that either Kinney or Austin perjured himself, and the Government should know which witness did so. Therefore, the Court concludes that the Government has a duty to correct the false testimony. *See Foster*, 874 F.2d at 495.

### 2. Snell

Miller argues that the Government knows that Austin perjured himself because the Government knows – or at the very least was negligent in not discovering – that it was impossible that Ruzicka drafted the amendment to his employment contract and that it was impossible that the contract was completed in one day. The Court will conclude that the Government should know that Austin's testimony was false and, therefore, has a constitutional duty to correct the perjured testimony. *Foster*, 874 F.2d at 495.

On February 9, 2018, Austin testified on direct that Ruzicka drafted an employment agreement in one day and had Austin sign it in:

Q. Okay. So what's your understanding regarding who drafted this contract?

A. I believe Mr. Ruzicka drafted it.

Q. Okay. So what happened after you agreed to provide him with a contract?

A. I – he went across to the 6600 building and prepared it on his computer and returned.

Q. Okay. Was it that same day that he came back with the contract?

A. Yes.

Q. And why is it that you believe he is actually the person who drafted the document?

    A.    Because he told me he was. He was quite proud of the fact that we didn't have to waste money on attorneys. He just did it himself.

Austin testified that, in December 2007, Ruzicka drafted and Austin signed an amendment to the contract:

    Q.    Okay. Now, after you executed this contract with Mr. Ruzicka, at some point did he come to you about an amendment to the contract?

    A.    He did.

           . . . .

    Q.    Is this a document that you signed with Mr. Ruzicka?

    A.    I did.

    Q.    Okay. And looking at the first paragraph of this document, it indicates an effective date of December 1 of 2007.

    A.    Yes.

    Q.    Do you believe that's about the date that you would have executed this contract with Mr. Ruzicka?

    A.    I believe so.

    Q.    Okay. So how did this amendment to the employment agreement come about?

    A.    **Mr. Ruzicka approached me on this day** and said that he was concerned in the event of my death if he would be paid his ten years, if the company would be able to pay it. He suggested as an alternative that I give him the retail business.

           . . .

    Q.    Now, a moment ago Mr. Conard was asking you about your understanding regarding who drafted this contract, and so

> Q. after you had your initial conversation with Mr. Ruzicka about the amendment, what happened?
>
> A. We talked, as we had about the first agreement, in principle. I outlined what I thought was a fair replacement for this ten years so he would have security in the event of my death. It was returned to me with some additional language that I did not talk to Mr. Ruzicka about, but I signed it because I assume that if we're selling the company he's helping me sell it before, that it would be the merger or acquisition. And so that's fair enough, and so it expanded a little bit. We just talked about my death.
>
> . . .
>
> Q. **Why do you believe that Mr. Ruzicka was the one who drafted this document?**
>
> A. Because **he drafted the first one**, and **it happened on about the same speed. He went over to the 6600, came back with the document, told me he did it himself, and I believed him, and I just presumed he did this second one, too, the amendment.**

Therefore, Austin testified that (1) Ruzicka approached him on December 1 with a proposal to amend his employment contract, (2) Ruzicka himself drafted the amendment, and (3) the amended employment contract was signed the same day it was discussed.

On February 15, 2018, Agent Matt Snell was shown a number of emails between Starkey's corporate counsel and outside counsel about the amendment to Ruzicka's employment agreement. Snell agreed that it was impossible for the document to be finalized in a single day or that the contract was drafted by Ruzicka:

> Q. In other words, it's not possible that [the amendment was drafted and signed] in one day as was elicited on direct, right?
>
> A. On whose direct?

-13-

> Q. **Bill Austin's direct. Not possible that that was done in one day, is it?**
>
> A. **No.**
>
> . . .
>
> Q. **Clearly wasn't done in one day. Clearly wasn't drafted by Jerry Ruzicka, right?**
>
> A. **Correct.**

Snell's testimony establishes that the Government knows that (1) the amended contract was not drafted and signed in one day and (2) Ruzicka did not draft the contract.

The Court finds that Austin provided false testimony. *See West*, 612 F.3d at 996. This is not a mere failure to recall who drafted the amendment to the contract and when. Austin testified at length and in great detail about the creation of this amended contract. Documentary evidence – as testified to by Snell – establishes that it is **impossible** for Austin's story to be true. Accordingly, the Court finds that Austin perjured himself with respect to the statements that (1) the amended contract was drafted and signed in one day and (2) Ruzicka drafted the contract.

The Court finds that the Government knows or should know that (1) the amended contract was not drafted and signed in one day, and (2) Ruzicka did not draft the contract. *See West*, 612 F.3d at 996. The Government's knowledge – or, at minimum, its negligence in investigating this matter – is borne out by Snell's testimony that Austin's statement on direct was not correct. *See Tierney*, 947 F.2d at 860-61. Because the perjured testimony was directly by documentary evidence and a Government agent, the Government should know that Austin perjured himself.

Finally, the Court finds that the falsity of this statement is material for a number of reasons. *See West*, 612 F.3d at 996. First, the fact that Austin perjured himself goes to his credibility as a witness. *See Napue*, 360 U.S. at 269. Second, Austin's knowledge about Ruzicka's conduct is central to this case. The Government introduced the contract, in part, to suggest that Austin was not aware of the entirety of the contents of the amended contract. Austin's perjury may suggest to the jury that Austin knew more about Ruzicka's employment contract – and perhaps Ruzicka's other dealings – than his testimony suggested. For these reasons, the Court finds that the falsity of the statement is material. *See West*, 612 F.3d at 996.

In sum, the Court finds that the Government knows that Austin perjured himself. Therefore, the Court concludes that the Government has a duty to correct the false testimony. *See Foster*, 874 F.2d at 495.

### III. REMEDY

The Court must briefly address the remedy in this case. Procedurally, this case arises at an odd time: during trial. Based on the Court's review of the case law, *Napue* violations are typically discovered **after** trial has concluded and therefore the typical remedy is a new trial. *See Giglio*, 405 U.S. at 154. A new trial is not required in this case because the constitutional violation can be avoided by requiring the Government to correct the record before the case is submitted to the jury.

It is the Government's duty – not the Court's or the Defendants' – to correct the false testimony as soon as false evidence appears. *See Foster*, 874 F.2d at 495. This is particularly true with respect to whether Austin told Kinney that he shreds the gross

-15-

descending income reports because only the Government has knowledge about which witness perjured himself.

Because a conviction cannot be obtained through the use of false testimony, the Government must ensure – as its constitutional duty – that all false testimony is removed from the record. *Napue*, 360 U.S. at 272. It is not enough for the Government to call back Austin, Kinney, or Snell, and have them testify to the accuracy of the perjured statements. Such a solution would leave the perjured testimony on the record and would not provide the jury with the information necessary to weigh the credibility of the affected witnesses.

The Court therefore concludes that the Government must identify **all** instances – including, but not limited to, the two identified by the Court – in which it knows that a Government witness perjured himself or herself. Because only the Government knows which statements are false, the Government should move to strike such statements from the record in front of the jury. The Court expects the Government to comply with its constitutional duty before closing arguments.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Lawrence W. Miller's *Napue* Motion [Docket No. 366] is **GRANTED IN PART AND DENIED IN PART**. Consistent with this Memorandum Opinion and Order, the Court **ORDERS** the Government to correct any testimony that it knows to be false before closing arguments.

DATED: February 27, 2018  
at Minneapolis, Minnesota.

_____  
JOHN R. TUNHEIM  
Chief Judge  
United States District Court